**RICHARD R. BEST**
**REGIONAL DIRECTOR**
**Lara Shalov Mehraban**
**A. Kristina Littman**
**John O. Enright**
**Mark R. Sylvester**
**Richard G. Primoff**
**Michael Baker**
**Gwen Licardo**
**Pamela Sawhney**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0148 (Primoff)**
**primoffr@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>                              **Plaintiff,**<br><br>              **-against-**<br><br>**BITCONNECT,**<br>**SATISH KUMBHANI,**<br>**GLENN ARCARO, and**<br>**FUTURE MONEY LTD.,**<br>                    **Defendants,** | **COMPLAINT**<br><br>**21 Civ. 7349 (    )**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against

Defendants BitConnect ("BitConnect"), Satish Kumbhani ("Kumbhani"), Glenn Arcaro

("Arcaro"), and Future Money Ltd. ("Future Money") (collectively, "Defendants"), alleges as

follows:

**SUMMARY**

1.      From approximately January 2017 to January 2018 (the "relevant period"),
Defendants conducted a fraudulent and unregistered offering and sale of securities in the form of
investments in BitConnect's purported "Lending Program," that ultimately succeeded in
obtaining more than 325,000 Bitcoin, or approximately $2 billion, from investors worldwide,
including from investors located in the United States.

2.      BitConnect, an unincorporated organization, and Kumbhani, its founder,
established a worldwide network of promoters, and rewarded them for their promotional efforts
by paying them commissions, a substantial portion of which they concealed from investors.
Among these promoters was Arcaro, whom Kumbhani and BitConnect engaged as the lead
national promoter of BitConnect for the United States, and who used the website he created for
his company, Future Money, to lure investors into the Lending Program.

3.      Arcaro formed his own network of United States-based promoters, which
included Trevon Brown ("Brown"), Craig Grant ("Grant"), Ryan Maasen ("Maasen") and
Michael Noble ("Noble") (the "Arcaro Promoters"). Each of the Arcaro Promoters is a named
defendant in a related case in the United States District Court for the Southern District of New
York, entitled *SEC v. Brown, et al.,* 21 Civ. 4791 (JGK).

4.      Arcaro and the Arcaro Promoters – none of whom was registered with the
Commission as a broker-dealer, or associated with a registered broker-dealer – touted the
supposedly lucrative potential of investing into the Lending Program to potential retail investors,
through "testimonial"-style videos they created and published on YouTube, sometimes multiple
times a day, with referral links to the Lending Program.

5.      To induce investors to deposit funds into the purported Lending Program, BitConnect and Kumbhani represented, among other things, that BitConnect would deploy a purported proprietary "volatility software trading bot" (the "Trading Bot") that, they claimed, would use investor funds to generate returns as high as 40% per month, and they posted fictitious returns on the BitConnect Website that amounted to, on average, 1% per day, or approximately 3,700% on an annualized basis.

6.      These claims were a sham. As Defendants knew or recklessly disregarded, BitConnect did not deploy investor funds for trading with its purported Trading Bot. Rather, BitConnect and Kumbhani siphoned investors' funds off for their own benefit, and their associates' benefit, by transferring those funds to digital wallet addresses controlled by Kumbhani, Arcaro, other promoters, including the Arcaro Promoters, and other unknown individuals.

7.      To mask the fact that they were not deploying investor funds to be traded with the purported Trading Bot they described to investors, BitConnect and Kumbhani conducted a Ponzi-like scheme in which they at times used funds deposited by newer investors in order to satisfy withdrawal demands made by earlier investors.

8.       In return for their promotional efforts, BitConnect and Kumbhani paid Arcaro and the Arcaro Promoters a percentage of the funds they raised from investors, in the form of "referral commissions" that ranged, initially, from 0.2% to 7% of the funds raised, and then, beginning on or about November 3, 2017, from 2% to a maximum of 5%.

9.      BitConnect and Kumbhani also paid Arcaro and other top promoters, including the Arcaro Promoters, additional sums from the monies investors paid, and which Defendants referred to as "development funds." These were commissions BitConnect and Kumbhani paid to

Arcaro and the Arcaro Promoters on a weekly basis on top of the referral commissions, and were calculated as a percentage of new loans made during that week by investors that were recruited by the individual promoter, or by investors that the individual promoter's investors had recruited.

10.     Unlike the referral commissions, which BitConnect publicly disclosed, Kumbhani and BitConnect, as Arcaro knew, did not publicly disclose the payment of these "development fund" commissions to promoters, and on the contrary actively sought to conceal this information from investors and potential investors.

11.     From the approximately 325,000 Bitcoin, or approximately $2 billion, that Kumbhani and BitConnect fraudulently induced investors to pay into the Lending Program and into their control, Arcaro and Future Money received more than $24 million in "referral commissions" and "development funds."

## VIOLATIONS

12.     By virtue of the foregoing conduct and as alleged further herein, Defendants BitConnect, Kumbhani, Arcaro and Future Money engaged in securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; Defendants BitConnect, Kumbhani, and Arcaro engaged in securities fraud in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Future Money engaged in securities fraud in violation of Sections 17(a)(1) and (3), of the Securities Act [15 U.S.C. § 77q(a)]; Defendants BitConnect, Kumbhani, Arcaro and Future Money engaged in the unregistered sale and offer to sell securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)] and Defendants Arcaro and Future Money violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

13.     Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

14.     The Commission brings this action pursuant to the authority conferred upon it by Securities Act Section 20(b) and Section 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

15.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) permanently enjoining Defendants as specified in the Prayer for Relief below; (c) ordering Defendants to disgorge all ill-gotten gains and/or unjust enrichment they received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) & 78u(d)(7)]; (d) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and, with respect to Defendants Arcaro and Future Money, also pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

17.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

18.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. Defendants, for example, solicited investors in this District. In addition, during the relevant time period, Arcaro maintained one or more accounts at a digital asset exchange and custodian company at a New York trust company headquartered in the District. To obtain payment from BitConnect for the conduct alleged here, Arcaro also transacted in Bitcoin between wallet addresses controlled by BitConnect and wallet addresses associated with his own individual accounts, and the accounts of others, at the New York digital asset exchange and custodian company.

## DEFENDANTS

19.     **BitConnect** is an unincorporated organization established in approximately 2016 by Kumbhani. Between July 2016 and September 2017, BitConnect registered several companies with Companies House in the United Kingdom: BitConnect Ltd., BitConnect International PLC, BitConnect Trading Ltd., and BitConnect Public Ltd. These entities are currently either defunct or dissolved.

20.     **Kumbhani**, age 35, is an Indian citizen who resided in Surat, India but whose current whereabouts are unknown. Kumbhani founded, managed, and controlled BitConnect at all relevant times.

21.     **Arcaro**, age 44, is a United States citizen residing in Moorpark, California. Arcaro served as BitConnect's lead national promoter in the United States from approximately August 2017 to January 2018. In that role, he was responsible for, among other things, promoting BitConnect and the Lending Program to retail investors and prospective investors in the United States, and communicating information and instructions from BitConnect to its

regional promoters, including the Arcaro Promoters, in the United States.

22.     **Future Money Ltd. ("Future Money")**, is a limited company incorporated by Arcaro in Hong Kong on October 12, 2017. Arcaro is the sole founder, director, and shareholder of Future Money.

## RELATED INDIVIDUALS

23.     **Brown**, age 32, resides in Myrtle Beach, South Carolina. He was a regional promoter for BitConnect under Arcaro.

24.     **Grant**, age 47, resides in Kissimmee, Florida. He was a regional promoter for BitConnect under Arcaro.

25.     **Jeppesen**, age 37, resides in East Falmouth, Massachusetts. Jeppesen was a "Continental Promoter" for BitConnect, and, starting in late October 2017, BitConnect's "Second United States National Promoter." In this capacity, Jeppesen served as a liaison between BitConnect and Kumbhani on the one hand, and BitConnect's national promoters, including Arcaro. Jeppesen is also a named defendant in the related case discussed above (*see* ¶ 3, *supra*) in the United States District Court for the Southern District of New York, entitled *SEC v. Brown, et al.,* 21 Civ. 4791 (JGK).

26.     **Maasen**, age 40, resides in Tulsa, Oklahoma. He was a regional promoter for BitConnect under Arcaro.

27.     **Noble**, age 52, resides in Pacific Palisades, California. He was a regional promoter for BitConnect under Arcaro.

## STATUTORY AND LEGAL FRAMEWORK

28.     Sections 5(a) and 5(c) of the Securities Act require that an issuer of securities, such as BitConnect, register offers and sales of those securities with the Commission when they

offer and sell securities to the public, absent certain specified exemptions. Registration statements relating to an offering of securities thus provide public investors with material information about the issuer and the offering, including financial and managerial information, how the issuer will use offering proceeds, and the risks and trends that affect the enterprise and an investment in its securities.

29.     The definition of a "security" under the Securities Act includes a wide range of investment vehicles, including "investment contracts." As the United States Supreme Court noted in *SEC v. W.J. Howey Co.*, Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," 328 U.S. 293, 299 (1946), such that "investment contracts" are instruments, schemes, or transactions through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others. Courts have found that novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, enterprises that exist only on the Internet, and sales of certain digital assets that exist on distributed ledgers or "blockchains."

30.     Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)] requires securities brokers to register with the Commission or, if they are individuals, to be associated with a brokerage firm registered with the Commission.

31.     This registration requirement ensures that, among other things, brokers have adequate supervision and training before soliciting funds from investors.

32.     While courts have recognized a number of factors that render a person a securities

broker (none of which by itself is dispositive), the hallmarks of being a broker include actively

soliciting investments (rather than passively obtaining them) and receiving transaction-based

compensation, often in the form of a percentage of the funds raised for investments.

## BACKGROUND ON DIGITAL ASSETS AND DISTRIBUTED LEDGERS

33.     The term "digital asset" or "digital token" generally refers to an asset issued

and/or transferred using distributed ledger or blockchain technology, including assets sometimes

referred to as "cryptocurrencies," "virtual currencies," digital "coins," and digital "tokens."

34.     A blockchain or distributed ledger is a peer-to-peer database spread across a

network of computers that records all transactions in theoretically unchangeable, digitally

recorded data packages. The system relies on cryptographic techniques for secure recording of

transactions.

35.     Entities have offered and sold digital assets in fundraising events, often called

initial coin offerings ("ICOs"), in exchange for consideration.

36.     Digital tokens may be traded on digital asset trading platforms in exchange for

other digital assets (such as Bitcoin) or fiat currency (*i.e.*, legal tender issued by a country).

37.     Some digital assets may be "native tokens" to a particular blockchain—meaning

that they are represented on their own blockchain. Like other "digital tokens," native tokens may

also be sold and traded for consideration.

## FACTS

### I.     Background: Kumbhani Created and Controlled BitConnect.

38.     In approximately 2016, Kumbhani created and developed BitConnect. To do so,

among other things, he created a digital token called the "BitConnect Coin" ("BCC"), which was

based on an algorithm he developed, and a blockchain (the "BitConnect Blockchain"), which he

managed. BCC was the "native token" of the BitConnect Blockchain.

39.     Kumbhani used fake names to register domain names for three BitConnect

websites -- https://bitconnect.co, https://bitconnect.com, and https://bitconnectcoin.co

(collectively, the "BitConnect Website"). The BitConnect Website provided information to the

investing public about, among other things, BitConnect, BCC, and the Lending Program, and

also provided an account login link.

40.     Kumbhani developed the "lending wallet," the investor interface for the Lending

Program on the BitConnect website. He hired a neighbor to develop the BitConnect Website and

implement the algorithms he had developed. Kumbhani used his own PayPal account to pay two

website hosting services to BitConnect.

41.     Kumbhani also used fake names such as "Vindee," "VND," and the Skype handle

"vndbcc" to communicate with BitConnect promoters and other third parties, including those

hired to write content for the BitConnect Website.

42.     By no later than 2017, Kumbhani drafted the content (*e.g.*, blog posts and news

updates), or reviewed and approved the content prepared by those he hired, that appeared on the

BitConnect Website.

43.     From no later than May 2017 and likely earlier, Kumbhani had access to the login

credentials to manage BitConnect's online presence, including the Website's Internet domain

registrar, web host providers, VPN providers, cloud infrastructure providers, and website

performance services, as well as for BitConnect's email accounts, Github profile, Apple ID,

Slack, and bitcointalk.org (an online discussion forum focused on Bitcoin, blockchain

technology, and cryptocurrency).

44.     From 2016 through at least January 2018, Kumbhani managed and supervised all

aspects of BitConnect's operations.

## II.    BitConnect Conducted an Initial Coin Offering in 2016.

45.    BitConnect claimed on the BitConnect Website that BCC "is an open source, peer-to-peer, community driven decentralized cryptocurrency." BitConnect also claimed that it was based on "decentralized blockchain transaction technology, so no centralized third party to trust [*sic*]. Transactions are performed directly between the users."

46.    From approximately November 2016 to January 2017, BitConnect conducted an ICO of BCC, during which BitConnect sold approximately 5 million BCC out of the maximum supply of 28 million BCC tokens that Kumbhani created upon the launch of the BitConnect Blockchain.

47.    In January 2017, BitConnect launched a purported digital asset trading platform on the BitConnect Website (the "BitConnect Exchange").

48.    BitConnect stated that users could buy, sell, and trade BCC for Bitcoin and *vice versa* on the BitConnect Exchange by transacting directly with other BCC holders in peer-to-peer transactions with "no central organization involved."

## III.   Defendants Engaged in an Unregistered Offering,
##        and Sale, of Investments in the Lending Program.

49.    Beginning in January 2017, Kumbhani and BitConnect offered investors the opportunity to participate in a series of schemes or transactions that would purportedly give them the opportunity to earn daily interest payments by essentially tendering Bitcoin to BitConnect in return for "interest" payments, *i.e.,* the "Lending Program."

50.    During the relevant period, Kumbhani and BitConnect posted daily interest rates, historical returns, periodic updates and news releases about the Lending Program on the BitConnect Website.

51.     From August 2017 (at the latest) to January 2018, BitConnect also advertised the Lending Program on Coinmarketcap.com, a popular website in the digital asset space that tracks price, available supply, trade volume, and market capitalization of various digital tokens.

52.     To participate in the Lending Program, an investor was first required to create an account on the BitConnect Website, and then to transfer Bitcoin to a Bitcoin blockchain address controlled, and provided to the investor, by BitConnect. The investor's account page on the BitConnect Website would then reflect the investor's Bitcoin investment in the investor's Bitcoin wallet. The investor could then remit the Bitcoin to BitConnect to purportedly purchase BCC tokens on the BitConnect Exchange, and then "lend" the BCC tokens to BitConnect, which, in turn, would purportedly invest these proceeds into the volatility of Bitcoin via the Trading Bot.

**A.     Lending Program Investments Were Securities.**

53.     The series of transactions, schemes, and contracts that comprised the Lending Program (offered by Kumbhani and BitConnect, and in which Arcaro and Future Money were necessary participants (as discussed below)), were investment contracts and, therefore, securities under the federal securities laws.

54.     Specifically, an investment into the Lending Program was an investment of money into a common enterprise from which investors had a reasonable expectation of profit based upon the efforts of others—BitConnect.

55.     BitConnect accepted consideration in the form of Bitcoin in exchange for investment into the Lending Program.

56.     BitConnect pooled investor assets (in the form of Bitcoin) into accounts that BitConnect controlled, and claimed all investors were entitled to the same supposed returns depending upon their level of investment and amount of time they committed or locked up their

funds into the Lending Program—no investor was entitled to a greater or lower return from their Lending Program investments than others.

57.     BitConnect touted the efforts that the purported Trading Bot it supposedly created would make in securing returns for investors—and marketed the handsome returns an investor could hope to obtain from participating in the Lending Program.

58.     Kumbhani and BitConnect claimed on the BitConnect Website that the interest returns investors would receive were generated by BitConnect's Trading Bot. In particular, they claimed that the Trading Bot generated returns by "tracking the **volatility of BTC** [Bitcoin] vs **USD** [the United States dollar ("USD")] and the volatility of USD against **major world currencies**" (the "Trading Bot") (emphasis in original).[1]

59.     The BitConnect Website claimed, for example, that "[t]he interest rate on lending will be calculated by our Bitconnect price volatility software. The earning interest on bitcoin lending float over the time [*sic*] and is exclusively decided by the software and Bitconnect Trading Bot. Bitconnect will consider last closing interest rate of Bitconnect price volatility software for next day's interest rate."

60.     Kumbhani and BitConnect marketed its Lending Program to prospective investors as a safe, profitable investment: "Investing on BitConnect platform, as you will find," they claimed on the BitConnect Website, "is a safe way to earn a high rate of return on your investment without having to undergo a significant amount of risk."

61.     The BitConnect Website featured an advertising banner promising profits as high as 40% interest per month "with no risk."

---

[1]     A "trading bot" is computer software programmed to trade a digital asset based upon pre-determined parameters.

62.     The BitConnect Website included a chart showing historical returns of up to 2%
daily, with no negative returns for any day, and an average daily return of approximately 1%, or
approximately 3700% on an annualized basis.

63.     The BitConnect Website also provided a "projected earnings calculator," which
purported to calculate projected future earnings on investors' loans by using the Lending
Program interest rates reported by BitConnect over the prior thirty days.

64.     BitConnect pooled the investors' Bitcoin in a series of addresses (also known as
"digital wallets"), which BitConnect controlled, on the Bitcoin blockchain.

65.     The Lending Program required investors to "lock-up" (commit) their funds for
investment to terms ranging between 120 days and 299 days.

66.     BitConnect purported to "pay" daily interest to Lending Program investors in the
form of credits denominated in USD appearing on each investor's individual account page on the
BitConnect Website. According to BitConnect, only the principal amount of the funds loaned by
investors were locked up, not the purported "interest," or "returns."

67.     The supposed interest payments generated by the Lending Program and an
investor's principal were represented as USD amounts, although BitConnect's Website did not
allow investors to withdraw funds, including supposed investment returns, in USD.

68.     Instead, to cash out interest or principal on a Lending Program investment, an
investor had to request that BitConnect convert the value displayed in USD back into BCC
tokens (only at the end of the "lockup" period in the case of principal), which the investor then
had to purportedly sell for Bitcoin on the BitConnect Exchange and, then, finally, the investor
would request that BitConnect send the Bitcoin to the investor's chosen address on the Bitcoin
blockchain.

69.     BitConnect marketed and promoted the Lending Program as paying investors

profits based solely upon BitConnect's entrepreneurial and managerial efforts.

70.     For example, the BitConnect Website's FAQs represented that the profit or

revenue BitConnect generated from its Trading Bot would be shared *pro rata* with the Lending

Program investors, and the FAQs described the Lending Program as follows:

> 1. When you invest in Bitconnect lending platform [*sic*], your
> investment directly goes to Bitconnect [T]rading [B]ot to generate
> profit.
> 2. Bitconnect volatility software calculate [*sic*] and **share** generated
> revenue to all members.
> 3. Members profit **deposited daily** [*sic*] on their lending wallet.
> 4. You can transfer it to BitConnect wallet at market price of
> BitConnect coin and exchange BitConnect coin to Bitcoin on
> exchange platform (emphasis in original).

71.     In fact, because BitConnect marketed the Trading Bot that formed the supposed

centerpiece of the Lending Program as proprietary, investors had no control over the success or

failure of their Lending Program investment and could take no steps that would determine the

fate of their investments—all investors could do was decide whether, when, and how much to

invest into the Lending Program, and whether to withdraw supposed returns before the lock-up

periods required them to do so.

72.     No registration statement was ever filed with the Commission, nor was any

registration statement in effect, for any of these offers or sales of investments into the Lending

Program.

73.     No exemption from the registration requirements under the federal securities laws

was at any time applicable to these offers and sales.

**B.** **Kumbhani and BitConnect Recruited Arcaro and Other**
**Promoters Through The Lending Program's "Referral Program."**

74. The series of schemes or transactions that comprised the Lending Program also included a "referral program."

75. To sell more Lending Program investments, Kumbhani and BitConnect, through BitConnect's Website, offered investors the opportunity to earn additional returns, as bonuses or "commissions," via a "referral program" that would offer payouts based on how many new investors the investor recruited into the supposed Lending Program.

76. Initially, Kumbhani and BitConnect offered a seven-tier structure of referral commissions, as described below, with the commission reflected on the investor's BitConnect Website account for every new investment directly or indirectly procured by the original investor or "sponsor."

77. For directly bringing in a new investor, the sponsor received 7% of the new investors' (the "Level 1 investors") investment value, denoted as a USD "credit" in the sponsor's BitConnect Website account.

78. The sponsor also received additional, residual referral commissions for any new investments made by investors recruited by the Level 1 investors, or by investors recruited by those investors continuing downstream, also known as a promoter's "downline." Thus, in addition to the 7% commission for a Level 1 investor, BitConnect credited a sponsor 3%, 1%, 0.5%, 0.3%, and 0.2% commissions on the investment of each investor brought in through the sponsor's downline, depending on the investment level (*i.e.*, 3% for investors procured by a promoter's Level 1 investor, 1% for investors procured by the foregoing investors, and so on). This structure was set forth by BitConnect utilizing the figure shown in Graphic 1, below.

| Level | Referral Bonus |
|-------|----------------|
| Level 1 | 7 % |
| Level 2 | 3 % |
| Level 3 | 1 % |
| Level 4 | 1 % |
| Level 5 | 0.5 % |
| Level 6 | 0.3 % |
| Level 7 | 0.2 % |

**Graphic 1: BitConnect Referral Program Payouts**

79.    On approximately November 3, 2017, Kumbhani and BitConnect changed the referral commission payout structure, reducing the commission levels to three tiers. Sponsors then received a 5% commission for the investment values of their Level 1 investors, a 3% commission for the investment values of any new investors their Level 1 investors brought in, and a 2% commission for the investment values of any investors those new investors brought in.

80.    Through the referral commissions and other means, Kumbhani and BitConnect organized a global network of promoters, with a hierarchy of regional, national, and continental promoters, and recruited such promoters by, among other things, advertising on the BitConnect Website.

81.    Though the referral program was an important component of Defendants' solicitation of investors, an investor's participation in the referral program was entirely optional—the investor could simply invest in the Lending Program and await the supposed returns on her investment based solely upon BitConnect's efforts via the supposed Trading Bot.

82.    Kumbhani and BitConnect used the referral program to attract more investors, as well as recruit those who would act as promoters.

83.     Their post on BitConnect's Website, entitled "Bitconnect promoters rules and regulation" and dated March 18, 2016, explained the role of BitConnect promoters:

> Bitconnect promoters…are able to attract new members online and offline. Bitconnect promoters will teach other Bitconnect members…how to attract participants in social networks, how to make promotional pictures, how to create your own blogs and websites…. A Promoter has an active role in Bitconnect System. He is a person who is responsible to control and guide his team. His primary duty is to consult and register new participants….
>
> A Promoter must be aware about all the activities and updates going on in BitConnect System. He should be well versed about how the system works, how to register new participants. He should know about the Current growth on Bitcoin lending and current referral commission, as well as, keep a daily watch on the official web-site Bitconnect.co for Updates…. All Promoters are required to execute any order given by the Bitconnect system without any undue delay.

84.     As part of their promotional efforts to recruit both investors and promoters, Kumbhani and BitConnect also sponsored in-person events promoting BitConnect and/or the Lending Program, which many BitConnect investors and promoters attended, during which BitConnect or BitConnect representatives promoted the Lending Program by displaying or gifting luxurious items to attendees.

85.     These promotional events included: (1) an event in Edison, New Jersey in May 2017; (2) an expenses-paid trip for promoters in Bangkok, Thailand in August 2017 (the "Bangkok Event"); (3) BitConnect's first and only "Annual Ceremony" in Pattaya, Thailand (the "Pattaya Event") in October 2017; (4) the Blockchain Expo North America in Santa Clara, California in November 2017 (the "Blockchain Expo") and a series of events coinciding with the Blockchain Expo in and around Santa Clara, California in November and December 2017 (the "Santa Clara Events"); and (5) an expenses-paid meeting for national promoters in Dubai in December 2017 (the "Dubai Event").

86.     Beginning in approximately April 2017, Arcaro began actively promoting BitConnect and the Lending Program, and at or about this time also became the "sponsor" (as described above, *see* ¶¶ 75-79, *supra*) of any investor in the Lending Program who used his referral link that he included with the videos he posted online.

87.     In a YouTube video created on or about August 4, 2017, for example, Arcaro announced, "I'm going to Bangkok on Monday to meet with the top promoter in Asia and scheme and devise some plans as to how we're going to blow up the U.S." Arcaro then attended the Bangkok Event, which Kumbhani also attended, and presided over.

88.     At the Bangkok Event, Kumbhani appointed Arcaro as the "national promoter" of BitConnect for the United States, and also appointed (either at the Bangkok Event or shortly thereafter) other individuals to be "national promoters" of other countries or regions.

89.     At the Bangkok Event, Kumbhani told Arcaro and other national promoters that BitConnect would pay "development funds" to be used by promoters to market BitConnect, and that these payments would also be for their own personal use, including Arcaro's. Kumbhani also told Arcaro and others that they would have discretion to allocate portions of their "development funds" to their regional promoters, *i.e.*, the promoters immediately beneath, or "downline" from them, in the promoter hierarchy.

90.     Although Kumbhani and BitConnect disclosed the referral program for the Lending Program on the BitConnect Website, they did not disclose that BitConnect's promoters would receive or were receiving additional compensation in the form of "development funds."

91.     In approximately August 2017, Kumbhani and BitConnect began paying its national promoters these commissions in the form of "development funds" each week by crediting the national promoters' BitConnect accounts with an amount denoted in USD.

92.     Kumbhani and BitConnect calculated each national promoter's weekly "development fund" commissions as a certain percentage of the total volume of new loans made by investors in the national promoter's downline during a given week.

93.     Shortly after Arcaro's appointment as the national promoter for the United States, Arcaro enlisted the Arcaro Promoters to be his regional promoters (and therefore in Arcaro's "downline") in the United States.

94.     In approximately October 2017, Kumbhani developed "promoter rules" for national promoters and regional promoters.

95.     Among the rules for "Top Promoters" (national promoters) were the following:

> "If your Regional Promoters make Youtube [*sic*] videos, watch over their channel and make sure everything on there is appropriate";

> "Provide weekly updates with Continental Promoter (i.e. events, overall numbers up or down, Issues, [*sic*] and so on)";

> "Get in touch with all your regional [promoters] and guide them if they need any help";

> "The development fund you are receiving is for bitconnect community development and marketing purpose. You can use some part of development fund for your personal use"; and

> "When you sell your development fund, make sure you are not selling all fund together. Sell small amount through out week [*sic*]."

96.     Among the rules for regional promoters were the following: "Verify with your Top Promoter before you make Bitconnect information public"; "Be available to the community to answer questions. (Email, Skype, Youtube)"; "Check in with your Top Promoter daily for news, updates, projects"; and "You will follow orders and work given by your top promoters."

97.     Kumbhani's assistant gave a presentation about these promoter rules to the national promoters at the Dubai Event.

98.     In October 2017, Kumbhani organized the Pattaya Event, a black-tie affair

recorded and publicly posted on YouTube, and advertised on the BitConnect Website as an opportunity for attending investors and promoters to "hear and learn from our top promoters as we award and recognize them for their success."

99.     At the Pattaya Event, which Arcaro attended, teams of promoters took turns taking the stage to give inspirational speeches and testimonials about their purported success with BitConnect, and BitConnect gave awards of cash and luxury cars to recognize the performance of several top promoters. Arcaro was awarded a car at the event.

100.     In November 2017, BitConnect sponsored a booth at the Blockchain Expo, complete with banners and signage bearing the BitConnect logo, and individuals representing BitConnect who interacted with the public.

101.     Kumbhani, Arcaro, and the Arcaro Promoters appeared at the BitConnect booth during the Blockchain Expo, where they met with Lending Program investors and prospective investors.

102.     Arcaro organized and paid for the Santa Clara Events, a series of several promotional events that occurred simultaneous with the Blockchain Expo, using funds received from BitConnect. Arcaro arranged to have the events (including a yacht party, wine tasting and catered happy hour in San Francisco) co-branded as BitConnect and Future Money events, and promoted them with the assistance of the Arcaro Promoters. On October 12, 2017, for example, BitConnect and Kumbhani promoted the Santa Clara Events on the BitConnect Website, describing them a "private yacht party with the Future Money Team," and a "winery vineyard tour high above Silicon Valley," open to "BitConnect promoters who have at least $1000 in active loans," and directing investors to a link on the Future Money website. In a vendor contract for these events dated October 5, 2017, Arcaro signed the contract as "President" of BitConnect

Ltd.

103.    Arcaro and the Arcaro Promoters attended the Santa Clara Events, and Kumbhani attended the yacht cruise. Arcaro paid for videographers to follow certain of the Arcaro Promoters around at the Santa Clara Events to generate promotion content for BitConnect and Future Money.

104.    In December 2017, Kumbhani organized a meeting of the BitConnect national promoters, including Arcaro, at the Dubai Event, in order to update the national promoters and select new ones. During the Dubai Event, presenters gave slide presentations, speeches, and updates on the Lending Program and reviewed the promoter rules. Kumbhani paid for the promoters' travel expenses to attend the Dubai Event.

### C.    Arcaro and Future Money Actively Promoted and Engaged in the Unregistered Offering and Sale of Investments in the Lending Program.

105.    In approximately April 2017, Arcaro began actively promoting BitConnect and the Lending Program through, among other things, events where Lending Program investors and promoters could meet in person, webinars, and YouTube videos.

106.    As a "sponsor" of any investor who used Arcaro's referral link to invest in the Lending Program (*see* ¶¶ 75-79, 86, *supra*), from April through early November 2017, Arcaro was entitled under BitConnect's referral program to receive up to 7% of the amount Level 1 investors invested in the Lending Program in referral commissions, and from November 2017, 5% of the invested funds.

107.    During the relevant period, Arcaro communicated with Kumbhani directly via communication channels on WhatsApp and Skype that Kumbhani used with the BitConnect national promoters. Arcaro was part of a group chat called "Top Promoters" managed by Kumbhani, and he had direct access to Kumbhani and met with Kumbhani in person at multiple

BitConnect meetings for national promoters.

108.    Kumbhani and BitConnect worked closely with Arcaro in his promotional activities, as noted above. For example, in August 2017, Kumbhani and BitConnect gave Arcaro a credit of $25,000 in his BitConnect account to fund his BitConnect promotional efforts. Arcaro used the funds—after converting them into Bitcoin and transferring the Bitcoin off the BitConnect platform—to create Future Money and set up Future Money's website, futuremoney.io.

109.    To induce interest and investment from the investing public, for example, Arcaro, in a YouTube video posted in mid-August 2017, noted that he had begun his BitConnect investment with $100, and was now traveling the world. Arcaro also stated that the BCC token had $700 million in market capitalization, according to coinmarketcap.com, stating "you do the math and see if people are making money."

110.    In the webinar that Arcaro conducted on or around August 23, 2017 with Noble, he also represented to investors and potential investors that "BitConnect has been paying interest every single day since March 11, 2016. I think that's just important to notice that they've been paying interest every single day."

111.    Arcaro also launched his Future Money website in September 2017, to promote BitConnect, and induce investors to deposit funds into the Lending Program. In Arcaro's posts and videos on Future Money's website, Arcaro held himself and Future Money out as knowledgeable and reliable sources on digital assets in general, and BitConnect in particular. For example, Arcaro designed a purported "cryptocurrency certification" course which he posted on the Future Money website in October 2017, with video tutorials that contained generic content about Bitcoin, and urged viewers to invest in the Lending Program. Arcaro described the

"cryptocurrency certification" course to Brown and Grant as a "sales funnel into bitconnect," and at Arcaro's request, the Arcaro Promoters also promoted the "cryptocurrency certification" course.

112.    More than 20,000 individuals registered to take the course, including individuals from the United States.

113.    One module of the "cryptocurrency certification" course, "Module 10," featured a publicly available video promoting the Trading Bot and the Lending Program, which stated:

> [Y]ou will want to make your first loan to the volatility bot . . . This is where you will make your choice as to how much Bitconnect you wish to loan and also how much 'volatility interest' you can earn. The powerful combination of the trading bot with the proprietary volatility software trades on the volatility of Bitcoin.  So the more volatile Bitcoin is . . . the higher percentage you can make every day!

114.    The video also stated:

> You can start investing in 'Bitconnect Lending'… a revolutionary way to earn DAILY PROFITS by allowing the proprietary volatility and trading bot to work its wonders for you.

115.    In a YouTube video Arcaro posted after the Bangkok Event in August 2017 where he was made the lead national promoter for the United States, Arcaro claimed to investors and potential investors that he had become more knowledgeable about the Lending Program's Trading Bot after a private meeting with the promoters and sought to generate interest and excitement in the investing public about the Lending Program:

> We learned so much about how the volatility software works this week in Thailand at this private promoters meeting. It just brings the belief level to a whole new level . . . they actually take some of the funds that are won on the winning days and they pull those aside. And so there's actually a reserve. And that's how . . . the software in the blockchain keeps it relatively fluid, right? That's why we don't have these wild days up and down.

116.    On or around September 1, 2017, Arcaro posted a YouTube video online stating:

>    I am the National Promoter now for BitConnect for the United States
>    . . . we are just getting started. There's lots of things that are planning
>    [*sic*] that is happening right now behind the scenes with the regional
>    promoters, with the events coming up . . . We're going to be doing
>    some great stuff at the Blockchain event in November.

117.    Between September 2017, when the Future Money website went live, and January 2018, the Future Money website contained a publicly available blog post titled, "What is Bitconnect?", which stated:

>    Bitconnect is a platform that makes it easier for anyone to start
>    trading in bitcoin and other cryptocurrencies . . . This is a single
>    platform that provides everything you need to make money from
>    bitcoin in a single place and makes it very easy for anyone to make
>    money.

118.    Between September 2017, when the Future Money website went live, and January 2018, the Future Money website contained a publicly available blog post titled, "Bitconnect and Bitcoin: What's the connection?", in which Arcaro and Future Money further touted the purported benefits of the Trading Bot:

>    What happens next is that you generate a daily profit. This is
>    possible thanks to volatility software. Volatility software is
>    software/trading bot is (sic) essentially software that trades in the
>    place of human investors. It can spot opportunities in the market
>    faster than you or I possibly could and then act to buy and sell . . .
>    [t]he interest offered by Bitconnect is higher than anything you
>    might be used to with traditional currency. We're talking minimums
>    of 0.25% per day . . .

119.    During this same period, the Future Money website contained a publicly available blog post titled, "Investing in Cryptocurrency with Bitconnect", which emphasized the purportedly safe and lucrative return investors would receive:

>    To use bitconnect to invest in cryptocurrency, you first need to 'buy'
>    bitconnect coins. You do this by depositing your bitcoins and getting
>    bitconnect coin back in return . . . This system means that bitconnect

coin can be used to represent any other form of cryptocurrency that
will then be used within a secure and straightforward p2p network .
. . You're just putting money into an incredibly safe and reliable
system and then getting more back out.

120.     Through BitConnect's multi-level referral program and "development fund"
commissions, Arcaro stood to benefit financially from his "downline" Arcaro Promoters, and he
urged them during the relevant period to promote the Future Money "cryptocurrency
certification" course and the Lending Program on social media such as Instagram, Facebook, and
through Google AdWords – which were targeted to users who showed an interest in Bitcoin or
other digital assets. These directed potential investors to the Future Money website and Arcaro's
YouTube videos promoting the Lending Program.

121.     Arcaro was intent on using Future Money and his promotional efforts (and those
of the Arcaro Promoters) to make as much money from BitConnect as possible, as quickly as
possible, and to become the highest-grossing promoter at BitConnect. For example, in October
2017, Arcaro told Jeppesen that his goal was to be the highest grossing person in BitConnect and
to make 1,000 Bitcoin through BitConnect. Two months later, Arcaro told Jeppesen that he had
met and even exceeded his goal of earning 1,000 Bitcoin.

122.     To a consultant he had hired to help him move his assets offshore, Arcaro, on or
about September 2017, also claimed that he was "the number one promoter of a cryptocurrency
called BitConnect. It's about No. 12 on the market cap chart . . . it's a technology that has a
trading bot and a volatility software that trades on the volatility of bitcoin . . . I'm what they call
the national promoter . . . all of the volume that comes in from the U.S. is essentially benefiting
me."

123.     In addition, in advance of the Pattaya Event, Arcaro messaged his downline
promoters Grant and Brown:

> People just want to be a part of something bigger than themselves.
> They're bored and they're (sic) lives generally suck. If they feel like
> they belong somewhere, all the guards come down, that's when they
> start investing for real. No (sic) this little 10k, 20k shit but real dough
> which is usually accessed in 401ks, IRAs, etc. . . .

124.    During these events, Arcaro appeared on videos that were later posted publicly on
the Internet, encouraging people to invest in the Lending Program.

125.    Defendants succeeded during the relevant period in obtaining more than
approximately $2 billion worldwide from investors through the unregistered offering and sale of
investments in the Lending Program.

**IV.    Defendants Engaged in a Fraudulent Scheme In Connection with the Offer and Sale
of Investments in the Lending Program**

**A.    Kumbhani and BitConnect Made Material
Misrepresentations and Omissions to Investors
and Prospective Investors Regarding the Lending Program.**

126.    The BitConnect Website represented that the interest rate returns investors would
purportedly receive from the Lending Program were and would be generated by BitConnect's
purported proprietary Trading Bot. The Trading Bot, they claimed, generated returns by
"tracking the **volatility of BTC** [Bitcoin] vs **USD** [the United States dollar ("USD")] and the
volatility of USD against **major world currencies**" (emphasis in original).

127.    Kumbhani and BitConnect further represented on the BitConnect Website that the
interest returns investors would receive from their investments into the Lending Program would
be calculated by the Trading Bot:

> The interest rate on lending will be calculated by our Bitconnect
> price volatility software. The earning interest on bitcoin lending
> float over the time [*sic*] and is exclusively decided by the software
> and Bitconnect Trading Bot. Bitconnect will consider last closing
> interest rate of Bitconnect price volatility software for next day's
> interest rate.

128.    To induce the public to invest in the Lending Program, Kumbhani and BitConnect

also posted purported daily interest rates and historical returns on the BitConnect Website. The BitConnect Website included a chart showing historical returns of up to 2% daily, with no negative returns for any day. The returns represented in the chart averaged on a daily and annualized basis, to approximately 1% and 3700%, respectively. The BitConnect Website also provided a "projected earnings calculator," which purported to calculate projected future earnings on investors' loans by using the Lending Program interest rates reported by BitConnect over the prior thirty days.

129.    Kumbhani and BitConnect also told investors on the FAQs of the BitConnect Website that the profits generated by the purported Trading Bot would be shared *pro rata* with Lending Program investors:

> 1. When you invest in Bitconnect lending platform [*sic*], your investment directly goes to Bitconnect trading bot to generate profit.
>
> 2. Bitconnect volatility software calculate [*sic*] and **share** generated revenue to all members.
>
> 3. Members profit **deposited daily** [*sic*] on their lending wallet.
>
> 4. You can transfer it to BitConnect wallet at market price of BitConnect coin and exchange BitConnect coin to Bitcoin on exchange platform.

130.    As Kumbhani and BitConnect knew or recklessly disregarded, all of these foregoing representations regarding the safety and profitability of the Lending Program, and its use of a Trading Bot to generate returns for investors, were materially false and misleading, and omitted to state facts that were necessary to make them not misleading.

131.    BitConnect did not send enough Bitcoin to digital asset trading platforms to deliver the returns it claimed. Had BitConnect genuinely been trading investors' Bitcoin, it would have had to transfer the Bitcoin to one or more digital asset trading platforms. But of the

approximate 325,000 Bitcoin investors paid to BitConnect, Kumbhani and BitConnect
transferred at most only approximately 8% of the Bitcoin directly to any digital asset trading
platform. And even counting indirect transfers of Bitcoin from BitConnect to digital asset trading
platforms, through as many as ten intermediary transactions, or "hops," only 35% of this Bitcoin
ever reached digital asset trading platforms.

132.    Of the small percentage of Bitcoin received by BitConnect that it sent to digital
asset trading platforms (directly or indirectly), moreover, the trading results associated with the
digital asset trading platform accounts that received that Bitcoin far underperformed the returns
claimed on the BitConnect Website. Indeed, those returns underperformed what investors would
have received solely from the increase in the value of Bitcoin, had they simply held on to their
Bitcoin over the same time period.

133.    In addition, distribution of the purported Trading Bot gains to investors would
have required BitConnect to send Bitcoin from the digital asset trading platforms back to its
wallet addresses. In fact, there were no large transfers of Bitcoin from digital asset trading
platforms back to BitConnect's wallet addresses, and only approximately 17% of inbound
Bitcoin sent to BitConnect came directly from a digital asset trading platform.

134.    As Kumbhani and BitConnect knew or recklessly disregarded, their claims that
BitConnect was using a Trading Bot to trade investors' Bitcoin, and that the Trading Bot was
generating the claimed returns, were therefore materially false and misleading.

135.    Instead, Kumbhani and BitConnect diverted the vast majority of investors' funds
to digital wallet addresses they controlled, or to other unknown persons. For example, from
January2017 to approximately December 6, 2017, BitConnect transferred approximately 13,135
Bitcoin (worth approximately $188 million as of December 6, 2017) to three accounts at a "hash

power brokerage" located in Slovenia.[2]

136.    BitConnect and Kumbhani did not disclose to investors that they were transferring

investor funds to a hash power brokerage in Slovenia, none of which were used to trade in the

volatility of Bitcoin using the purported Trading Bot. Rather, a significant portion of the

transferred assets were invested in purchasing Bitcoin mining capacity and in return received

block rewards. In addition, some of the transferred assets were sent to external wallets. On or

around December 6, 2017, approximately 164.38 Bitcoin transferred by BitConnect

(approximately $1.71 million at the time) was stolen in a hack of the hash power brokerage.

137.    Kumbhani and BitConnect also diverted a substantial portion of investor funds to

Kumbhani, Arcaro and others in the form of referral, and "development fund" commissions, the

latter of which Kumbhani and BitConnect did not disclose to, and actively sought to conceal

from, investors.

138.    During the relevant period, in fact, Kumbhani and BitConnect transferred more

than $12.4 million to wallet addresses known to be controlled by Kumbhani.

139.    In addition, because Kumbhani and BitConnect were not using investor funds to

generate the trading profits represented to investors (using the Trading Bot), they also used funds

received by newer investors to satisfy the withdrawal demands made by earlier investors in the

Lending Program, a fact they knowingly or recklessly did not disclose to investors and

prospective investors.

140.    As the individual who founded and created BitConnect, BCC, and the Lending

Program, Kumbhani knew or recklessly disregarded that the foregoing representations regarding

the safety and profitability of the Lending Program, and BitConnect's use of a purported Trading

---

[2] A "hash power broker" connects sellers of hash (computing) power (i.e., blockchain miners) with buyers of hash
power.

Bot to generate lucrative and safe returns for investors, were false.

141.    At all relevant times, in fact, Kumbhani sought to conceal from the investing

public that the Lending Program and BitConnect's claims about the Trading Bot were a sham.

Kumbhani declined to provide any evidence, when asked, to corroborate the existence of the

Trading Bot or how it operated.

142.    During an August 2017 videotaped interview at the Bangkok Event, that he knew

would be posted on YouTube, Kumbhani was asked whether BitConnect would show the

Trading Bot in action. Kumbhani responded:

> Everybody is waiting to see the trading bot — how it is in action and
> how we are getting the profit from the system. But . . . system has
> some privacy, not to show you where the bot is working and how it
> is working (*sic*). Last night we had the meeting of the top promoters
> from all around the world. And we have shown the people and
> shown the promoters that there are some logics working behind the
> trading bot . . . For privacy reasons we are not disclosing anything
> about our last meeting.

### B.    Kumbhani and BitConnect Created the Materially False Appearance of a Legitimate Trading Platform.

143.    Kumbhani also knowingly or recklessly created a misleading user interface

designated as the "BitConnect Exchange" on the BitConnect Website to create the false

appearance of a decentralized, legitimate trading platform.

144.    As discussed above, *see* ¶ 52, *supra,* investors in the Lending Program were

required to create user accounts on the BitConnect Website, and transfer their Bitcoin to a

blockchain address provided to the investor and controlled by BitConnect. The investors'

account pages would reflect their Bitcoin investment, whereupon they could then purchase BCC

tokens and, to participate in the Lending Program, "lend" the BCC tokens back to BitConnect for

designated "lock-up" periods.

145.    The BitConnect Website would display a purported credit for an investor in the Lending Program, including purported interest payments, in USD amounts. To actually withdraw those sums, investors were required to request conversion of the represented USD amounts into BCC tokens, which the investor then had to sell for Bitcoin on the BitConnect Exchange, and then request for that Bitcoin to be transferred to the investor's external wallet address on the Bitcoin blockchain.

146.    Kumbhani and BitConnect claimed, moreover, that investors in the Lending Program could buy, sell and trade BCC for Bitcoin (and *vice versa*) on the BitConnect Exchange by transacting directly with other BCC holders in peer-to-peer transactions with "no central organization" involved.

147.    In reality, however, in the vast majority of BitConnect Exchange transactions, investors never took control of the BCC coins they purportedly purchased in exchange for Bitcoin. Instead, BitConnect itself was the investors' counterparty—not other BitConnect users. BitConnect accepted investors' Bitcoin, and created only the appearance of delivering BCC tokens to each investor by issuing a credit to their BCC wallets in their BitConnect accounts.

148.    Contrary to BitConnect's claim that there was "no central organization involved," and as Kumbhani and BitConnect knew or recklessly disregarded, BitConnect retained custody of most of the BCC tokens involved in the BitConnect Exchange transactions. For the vast majority of BitConnect's investors, their BCC transactions did not appear on the BCC Blockchain—as they would have if ownership of BCC tokens had changed hands—and their ownership of BCC tokens was simply recorded, if at all, as an entry in BitConnect's private database.

149.    In this way, as Kumbhani and BitConnect knew or recklessly disregarded, the

32

BCC Blockchain functioned essentially as a materially misleading marketing ploy, luring investors seeking the benefits of distributed ledger technology by creating the false appearance of a secure, decentralized, and technologically sophisticated platform that permitted investors to transact with third-parties, and not with the central authority—BitConnect itself.

### C.   Arcaro and Future Money Made Material Misrepresentations and Omissions to Investors and Prospective Investors Regarding the Lending Program.

150.    Arcaro and Future Money also repeatedly made false and misleading representations to investors and potential investors in the Lending Program regarding (1) the safety and profitability of the Lending Program, and (2) Arcaro's expertise and knowledge of the same.

151.    In the webinar that Arcaro conducted in late August 2017 with Noble, for example (*see* ¶ 110, *supra*), Arcaro represented to investors and potential investors that "BitConnect has been paying interest every single day since March 11, 2016. I think that's just important to notice that they've been paying interest every single day."

152.    Module 10 of Arcaro's "cryptocurrency certification" course, that he posted on his Future Money website (*see* ¶ 113, *supra*), promoted the Trading Bot and the Lending Program, stating:

> [Y]ou will want to make your first loan to the volatility bot . . .  This is where you will make your choice as to how much Bitconnect you wish to loan and also how much 'volatility interest' you can earn. The powerful combination of the trading bot with the proprietary volatility software trades on the volatility of Bitcoin.  So the more volatile Bitcoin is . . . the higher percentage you can make every day!

153.    The video also stated:

> You can start investing in 'Bitconnect Lending'… a revolutionary way to earn DAILY PROFITS by allowing the proprietary volatility and trading bot to work its wonders for you.

154.    Arcaro's video tutorial in the "cryptocurrency certification" course, also represented that investors would achieve returns (albeit lower than those claimed on the BitConnect Website) of 8-10% per month.

155.    After the Bangkok Event in August 2017, Arcaro again touted the Trading Bot, to investors and potential investors (*see* ¶ 115, *supra*) and claimed he had become more knowledgeable about the Lending Program's Trading Bot after a private meeting with BitConnect and the promoters, and sought to generate interest and excitement in the investing public about the Lending Program:

> We learned so much about how the volatility software works this week in Thailand at this private promoters meeting. It just brings the belief level to a whole new level . . . they actually take some of the funds that are won on the winning days and they pull those aside. And so there's actually a reserve. And that's how . . . the software in the blockchain keeps it relatively fluid, right? That's why we don't have these wild days up and down.

156.    In the Future Money website blog post titled, "Bitconnect and Bitcoin: What's the connection?" and published between September 2017 and January 2018 (see ¶ 118, supra), Arcaro also touted the Trading Bot:

> What happens next is that you generate a daily profit. This is possible thanks to volatility software. Volatility software is software/trading bot is (sic) essentially software that trades in the place of human investors. It can spot opportunities in the market faster than you or I possibly could and then act to buy and sell . . . [t]he interest offered by Bitconnect is higher than anything you might be used to with traditional currency. We're talking minimums of 0.25% per day . . .

157.    During this same period (*see* ¶ 119, *supra*), Arcaro's Future Money website published a blog post titled, "Investing in Cryptocurrency with Bitconnect," which emphasized the purportedly safe and lucrative return investors would receive:

> To use bitconnect to invest in cryptocurrency, you first need to 'buy' bitconnect coins. You do this by depositing your bitcoins and getting bitconnect coin back in return . . . This system means that bitconnect coin can be used to represent any other form of cryptocurrency that will then be used within a secure and straightforward p2p network . . . You're just putting money into an incredibly safe and reliable system and then getting more back out.

158.    Arcaro's posts and videos on the Future Money website used the BitConnect logo, and relayed BitConnect's claims about the safe and profitable returns its Trading Bot supposedly generated.

159.    As discussed above, as Arcaro and Future Money knew or recklessly disregarded, these foregoing representations about the Lending Program and the Trading Bot, and his own expertise, knowledge and research regarding the Trading Bot in particular, were materially false and misleading, and omitted material information necessary to make them not misleading.

160.    Arcaro knew or recklessly disregarded that BitConnect was not employing a Trading Bot to trade investor funds, much less generate profitable returns for investors in the Lending Program.

161.    Contrary to his public claims to be an authority on cryptocurrency and to having inside knowledge as to how the Trading Bot worked, Arcaro privately admitted to Noble after the Bangkok Event that he knew nothing about the Trading Bot. In fact, as Arcaro knew, Arcaro had never seen it, and Kumbhani had in fact refused to show it to Arcaro or the other promoters.

162.    In addition, Arcaro knowingly or recklessly concocted his own fictitious (albeit lower) projections of returns of 8-10% per month, and included them in his video tutorials as part of his Future Money "cryptocurrency certification" course. On or about September 17, 2017, Arcaro explained privately to his Future Money copywriters that BitConnect would be changing its stated investment returns to these figures as they were "more sustainable," and that this

information was "late-breaking and isn't even public yet." Arcaro never disclosed these

purported facts to investors or prospective investors.

163.    Contrary to what Arcaro told his copywriters, and as Arcaro knew or recklessly

disregarded, after September 17, 2017, BitConnect never changed its reported returns to the 8-

10% monthly figures Arcaro fabricated and publicized. Arcaro knowingly or recklessly

continued to maintain his own fictitious projections of returns in the Future Money

"cryptocurrency certification" course, which he continued to maintain on the Future Money

website during the relevant period.

164.    Arcaro was also aware of other "red flags" during the relevant period that cast

doubt on the legitimacy of BitConnect's claims, and which he knowingly or recklessly

disregarded. Arcaro, for example, was aware by August 2017 (as he acknowledged in a video he

posted on YouTube to address rumors that BitConnect was a scam), that an office address used

by BitConnect in a United Kingdom filing for one of its United Kingdom entities was fictitious.

And even after Arcaro was aware that this address was fake, he knew that an event planner he

hired to promote BitConnect was executing contracts with vendors on behalf of BitConnect Ltd.,

using Arcaro's name, his purported title of BitConnect Ltd.'s "President," and the fictitious

address.

165.    Arcaro was also aware, by no later than September 2017, that BitConnect listed

him as a "Director" of one of those companies, BitConnect International PLC, a fact he did not

publicly object to until January 2018, after state securities authorities had ordered BitConnect to

cease and desist.

166.    Arcaro was also aware that BitConnect and Kumbhani sought to conceal from

investors their diversion of investor funds in the form of "development fund" commissions, and

on several occasions in the fall of 2017, told Grant and Brown, at Kumbhani's request, to remove social media content they had posted that discussed those payments. In approximately December 2017, Arcaro admonished Noble for inadvertently showing his "development fund" commissions in a YouTube video.

167.    Arcaro took an active role in the use of investor funds to make "development fund" commission payments, as he personally allocated those payments to the Arcaro Promoters on the "Promoter" tab section of their dashboards on the BitConnect Website. Arcaro had full discretion over how much "development fund" commissions to pay to each Arcaro Promoter.

**D.    Defendants Profited From Their Fraudulent Scheme, While Investors Sustained Enormous Losses.**

168.    On January 4, 2018, the Texas State Securities Board issued a cease-and-desist order to BitConnect.

169.    On January 9, 2018, the North Carolina Secretary of State Securities Division followed suit and issued its own cease-and-desist order to BitConnect.

170.    In early-to-mid January 2018, Arcaro removed his YouTube videos promoting BitConnect.

171.    On January 12, 2018, Arcaro texted his personal assistant: "The system said do not post any [B]itconnect videos for the time being."

172.    The next day, January 13, 2018, he texted her another message: "BitConnect is down because of server maintenance. Tell your teams."

173.    Just before the BitConnect Lending Program shut down, Arcaro called Noble and told him he did not know what was going on with BitConnect and that he was "going to go dark."

174.    On January 16, 2018, BitConnect announced that it was closing the Lending

Program and the supposed BitConnect Exchange immediately:

> We are closing the lending operation immediately with the release of all outstanding loans. With release of your entire **active loan** in the lending wallet **we are transferring all your lending wallet balance to your Bitconnect wallet balance at 363.62 USD**. This rate has been calculated based on last 15 days averages of the closing price registered on coinmarketcap.com (emphasis in original.

175.    On January 16, 2018, the stated price of BCC on the BitConnect Website dropped precipitously, losing 92% of its purported value.

176.    The week after the BitConnect Lending Program was closed, many investors sought to withdraw their funds but were unable to access the BitConnect Website, which was either offline or inoperable for long periods of time.

177.    Investors found there was no market demand for their BCC tokens, and the price of BCC was so low that their investments were suddenly worth a small fraction of the value of just a week before. Any investor who had not cashed out before this point lost all or nearly all of his or her funds invested in the Lending Program.

178.    Defendants, meanwhile, profited substantially from their perpetration of this fraudulent scheme, with Kumbhani and BitConnect obtaining control of approximately 325,000 Bitcoin, or approximately $2 billion, from investors worldwide during the relevant period.

179.    Arcaro received a total, approximately, of more than $24 million in the form of referral and "development fund" commissions from BitConnect, in exchange for inducing the investing public to invest in the Lending Program, none of which was comprised of a fixed salary, hourly wage, or other compensation from BitConnect that was not tied to the amount of funds he raised from investors for the BitConnect Lending Program.

## FIRST CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5
### (All Defendants)

180.     As to Defendants BitConnect and Kumbhani, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1-179, and as to Defendants Arcaro and Future Money, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1-37, 45-142, and 150-179.

181.     As alleged above, Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

182.     By reason of the foregoing, Defendants violated and, unless enjoined, will again violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (BitConnect, Kumbhani and Arcaro)

183.     As to Defendants BitConnect and Kumbhani, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1-179; and as to Defendant Arcaro, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1-37, 45-142, and 150-179.

184.     As alleged above, Defendants Bitconnect, Kumbhani and Arcaro directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

185.     By reason of the foregoing, Defendants BitConnect, Kumbhani and Arcaro, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)(1) and (3)
### (Future Money)

186.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1-37, 45-142, and 150-179.

187.     As alleged above, Defendant Future Money, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (a) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, and/or (b) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

188.   By reason of the foregoing, Defendant Future Money, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) & (3)].

## FOURTH CLAIM FOR RELIEF
### Violations Securities Act Sections 5(a) and (c)
### (All Defendants)

189.   The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1-125, and 166-179.

190.   As alleged above, Defendants BitConnect, Kumbhani, Arcaro and Future Money, directly or indirectly, singly or in concert, (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

191.   By reason of the foregoing, BitConnect, Kumbhani, Arcaro and Future Money violated and, unless enjoined, will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

## FIFTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 15(a)
### (Arcaro and Future Money)

192.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1-37, 45-125, and 166-179.

193.     As alleged above, Defendant Arcaro, as a natural person not associated with a broker or dealer which is a person other than a natural person, made use of the mails or any means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, any security without being registered with the SEC as a broker-dealer.

194.     As alleged above, Defendant Future Money made use of the mails or any means or instrumentality of interstate commerce to effect transactions in securities without registering as a broker-dealer.

195.     By reason of the foregoing, Defendants Arcaro and Future Money violated, and, unless enjoined, will again violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### II.

Permanently enjoining Defendants and their agents, servants, employees and attorneys

and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 5 [15 U.S.C. §§ 77e].

## III.

Permanently enjoining Arcaro and Future Money and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 15(a) [15 U.S.C. §78o(a)];

## IV.

Permanently prohibiting Kumbhani and Arcaro from (a) offering, operating, or participating in any marketing or sales program in which the participant is compensated or promised compensation solely or primarily (1) for inducing another person to become a participant in the program, or (2) if such induced person induces another to become a participant in the program; and (b) participating, directly or indirectly, in any offering of digital asset securities; *provided, however*, that such injunction shall not prevent any of them from purchasing or selling digital asset securities for their own personal accounts, pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)];

## V.

Permanently prohibiting Future Money from (a) offering, operating, or participating in any marketing or sales program in which the participant is compensated or promised compensation solely or primarily (1) for inducing another person to become a participant in the program, or (2) if such induced person induces another to become a participant in the program; and (b) participating, directly or indirectly, in any offering of digital asset securities, pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)];

## VI.

Ordering Defendants to disgorge all ill-gotten gains and/or unjust enrichment they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) & 78u(d)(7)];

## VII.

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

## VIII.

Granting any other and further relief this Court may deem just and proper.

## <u>JURY DEMAND</u>

The Commission demands a trial by jury.

Dated: New York, New York
       September 1, 2021

                 /s/Richard R. Best
                 RICHARD R. BEST
                 REGIONAL DIRECTOR
                 Lara Shalov Mehraban
                 A. Kristina Littman
                 John O. Enright
                 Mark Sylvester
                 Richard G. Primoff
                 Gwen Licardo
                 Pamela Sawhney
                 Attorneys for Plaintiff
                 SECURITIES AND EXCHANGE COMMISSION
                 New York Regional Office
                 Brookfield Place
                 200 Vesey Street, Suite 400
                 New York, New York 10281-1022
                 (212) 336-0148 (Primoff)
                 primoffr@sec.gov

Of Counsel: Michael Baker (Not admitted in New York)